UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:24-CV-24830-KMM

RICCARDO USAI, MASSIMILIANO GIUA,
IRINA SLIZSKAYA, and MEYVIS VEGA,

       Plaintiffs,

vs.

CLUB MANAGEMENT MIAMI II, LLC, and
R. DONAHUE PEEBLES,

       Defendants.
_____/

## DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF FLSA CLAIMS

Defendants, CLUB MANAGEMENT MIAMI II, LLC ("Club Management") and R. DONAHUE PEEBLES ("Peebles"), pursuant to this Court's Notice of Court Practice in Fair Labor Standards Act Cases [ECF 50], offer the following response to the statement of claim [ECF 60] filed by Plaintiffs, Riccardo Usai ("Usai"), Massimiliano Giua ("Giua"), Irina Slizskaya ("Slizskaya") and Meyvis Vega ("Vega").[1]

## INTRODUCTORY STATEMENT

Each of the four (4) Plaintiffs were previously employed by Club Management: Usai and Giua were managers charged with overseeing the operations of Club Management's "The Bath Club" on Miami Beach, Florida; Slizskaya was the Food & Beverage Manager for The Bath Club; and Vega worked as a server (or captain) at The Bath Club.

---

[1] Defendants will respond to Slizskaya's and Vega's claims only because (i) Usai and Giua do not seek unpaid wages under their Counts V and VI as to retaliation [*see* ECF 60 at 4], and (ii) the claims of Usai and Giua have been stayed pending appeal of Defendants' motion to compel arbitration [ECF 49].

In the Amended Complaint [ECF 57], Slizskaya and Vega have asserted the following claims arising under the Fair Labor Standards Act (the "FLSA"):

Count I – FLSA wage theft (Slizskaya v. Defendants)
Count II – FLSA wage theft (Vega v. Defendants)
Count III – FLSA retaliation (Slizskaya v. Defendants)
Count IV – FLSA retaliation (Vega v. Defendants)

The premise of Defendants' alleged liability to Slizskaya and Vega is that "Defendants implemented and maintained an unlawful compensation system for their tipped employees" [ECF 60 at 1], which presupposes (i) that Slizskaya and Vega were tipped employees, and (ii) that Defendants maintained and unlawful compensation system, even though, at all relevant times, Slizskaya and Vega worked at The Bath Club under the supervision of Usai and Giua.

To be clear, and as set forth in detail below, Slizskaya was an exempt employee to whom the FLSA is inapplicable; and Vega was paid all wages owed in accordance with the FLSA. Moreover, Peebles was never the employer of Slizskaya and Vega; and Club Management has no liability to Slizskaya and Vega for wage theft, liquidated damages or attorneys' fees and costs.

### I. SLIZSKAYA WAS AN EXEMPT EMPLOYEE

Plaintiffs claim that, "During her employment from approximately January 1, 2023 through June 29, 2023, Plaintiff Irina Slizskaya was compensated pursuant to Defendants' unlawful flat-rate system."[2] This claim can be no further from the truth since Plaintiffs' own documents produced unequivocally demonstrate that Slizskaya was an exempt employee (the Food & Beverage Manager) who was paid a salary of $2,500 biweekly, or $65,000 annually. *See* Plaintiffs BC000001-7, attached hereto as Exhibit "A."

---

[2] This system of pay will be addressed at pp. 4-5, *infra*.

2

**ASSOULINE & BERLOWE, P.A.**
2385 N.W. Executive Center Drive, Suite 100, Boca Raton, FL 33431 • Telephone: 561-361-6566

Although Slizskaya's exempt status should alone be disqualifying to her claim for relief under the FLSA, it must be pointed out that Slizskaya was selected by Usai and Giua for termination as part of a restructuring/cost-saving measure on June 28, 2023. *See* CLUBMIAM000291-292, attached as Exhibit "B" and CLUBMIAMI000042 attached as Exhibit "C." These documents verify both Slizskaya's position as Food & Beverage Manager[3] and her selection for termination as part of a "layoff" by Plaintiffs Usai and Giua, which nullify any claim Slizskaya has that she was terminated in retaliation for engaging in any activity protected under the FLSA, even if the FLSA applied to her (which it does not)

As an exempt, salaried employee, Slizskaya was not entitled to and did not receive tips. *See* Exhibit "F," which are tip reports produced by Club Management that have been are highlighted to show Slizskaya never received any tips. Accordingly, Slizskaya's claim for $42,120 for "unpaid tipped wages" and an additional $42,120 for liquidated damages is vehemently denied.

## II. VEGA RECEIVED ALL WAGES OWED

At all times during Vega's employment by Club Management at The Bath Club, she worked as a server or a captain and was compensated as follows: $240 per 8-hour shift, or roughly $30 per hour. This was a payment policy that Usai and Giua put in place or otherwise maintained throughout Vega's tenure, which was from approximately February 2023 through August 2023.[4]

---

[3] In Defendants' request for admissions, they asked both Usai and Giua to "[a]dmit that, during the time you worked for The Bath Club, Irina Slizskaya was the food and beverage manager." Each stated, "during a period of Ms. Slizskaya's employment with Defendants, she held the position of Food and Beverage Manager." *See* Exhibits "D" and "E." While Defendants recognize that title alone does not establish Slizskaya's exempt status, her compensation as a salaried employee (Exhibit "A") and the duties she performed as Food & Beverage Manager at The Bath Club, including frequently discounting members' charges (Exhibit "F"), certainly support the exemption.

[4] The irony of Usai and Giua joining in a lawsuit with Slizskaya and Vega, who are challenging practices that Usai and Giua put in place as managers of The Bath Club, cannot be lost on this Court.

a. **<u>Servers Like Vega Were Paid $240 Per Day</u>**

The Bath Club, a private, members-only club on South Beach, was, at all times, "cashless." Its patrons were members of The Bath Club who had established accounts secured with a credit card, and all charges for food and beverage – plus a mandatory 23% service charge[5] – were posted to the member's account. Members were not required to tip and seldom did so.[6]

Thus, rather than treating servers like Vega as customarily tipped employees – who, during the period from February 2023 through August 2023, would have been paid a tipped wage of $7.98 per hour, and Club Management would take a $3.02 tip credit to ensure Vega was paid the Florida minimum wage of $11.00 per hour – Club Management guaranteed all servers would be paid $240 per shift (or $30 per hour), which was *far* in excess of the minimum wage requirement.[7]

In order to meet the $240 per shift guarantee, Club Management did the following:

---

[5] The mandatory 23% service charge was not a tip. *See* 29 C.F.R. § 531.55(a) (since the amount and whether to pay a mandatory service charge is not determined by the customer, such a service charge is not a tip and can be used to meet the employer's wage obligations under the FLSA). Conversely, a tip – the amount and whether one is to be given – are matters determined solely by the customer. C.F.R. § 531.52(a). *See* pp. 6-7, *infra*.

[6] As evidenced from Exhibit "F," Vega seldom, if ever, received tips and most times the amounts paid were quite small. *See* May 29, 2023 ($388.50 check and $3.10 tip). However, on a few occasions, the amount charged to the member was so nominal in comparison to the tip Vega received that it appears Vega discounted the members' charges in exchange for a large tip. *See* entries dated March 4, 2023 ($5 check and $106.50 tip), March 10, 2023 ($5 check and $120 tip), March 24, 2023 ($18 check and $200 tip) and May 6, 2023 ($.01 check and $50 tip).

[7] The mangers of The Bath Club decided on this arrangement for a variety of factors, including the fact that members of The Bath Club from other countries might not be familiar with U.S. tipping policies. Managers wanted to ensure servers would be well compensated for their work even during times of the year when business was slow (as in the summer months and during the rainy seasons). This arrangement remained in place during Usai and Giua's tenure as managers of The Bath Club, and they sought to continue and refine the system. *See* p. 9, *infra*.

- Paid each server $8.65 per hour[8], or $12.97 per hour for all overtime hours worked, multiplied by the number of hours (and overtime hours) worked each week;

- Computing a *pro rata* share of the 23% service charges collected by the server on their individual food and beverage sales;

- Then deducting from the 23% service charges attributable to each server 6% for food and beverage staff, leaving the server with 17% of the service charge;

- Adding (1) the hourly wages ($8.65 per hour multiplied by the number of hours worked), (2) the 17% service charge, and (3) any tips received by the server (which were voluntarily added by members, belonged to the server, and were not shared with any other employees), to ensure that each server was paid $240 per day (or per eight-hour shift);

- If the total of the items (1), (2) and (3) did not meet the $240 per day requirement, Club Management made a contribution (or a "guarantee") to ensure the server received $240 per shift.

For illustration, attached is an Excel spreadsheet (Exhibit "H") that demonstrates the foregoing method of computation.

As evidenced from Vega's paystubs, Club Management did pay her approximately $30-$35 per hour for each hour worked during a bi-weekly pay period. *See* Plaintiffs BC000020-000021, attached hereto as Exhibit "I." The "adjustments" show the additional income added to Vega's bi-weekly compensation to ensure she was paid $240 per shift. Although Vega received payments in accordance with the methodology described above and even acknowledges the "predetermined flat rate for each shift ($240.00)" [ECF 60 at 1-2], she nonetheless claims that Defendants "unlawfully retained all tips and service-charge proceeds generated that exceeded the flat rate payment." *Id.* There is no question that Vega received whatever tips she earned; as for the service charges, Vega received those as well and were distributed to her so that Club Management could meet – and exceed – its minimum wage obligations.

---

[8] Vega's hiring document is attached as Exhibit "G." Although difficult to read, the document indicates that Vega was to be paid $8.65 with an "hourly rate" of $35, presumably based on the $240 per shift guarantee.

b. **<u>Club Management satisfied its minimum wage obligations to Vega and other servers by distributing the mandatory service charges collected from members of The Bath Club.</u>**

The service charges collected were neither tips nor required to be distributed to employees; but Club Management did so in order to meet its minimum wage obligations, which is wholly permissible under the FLSA. Indeed, 29 C.F.R. § 531.55 provides:

> (a) A compulsory charge for service, such as 15 percent of the amount of the bill, imposed on a customer by an employer's establishment, is not a tip and, even if distributed by the employer to its employees, cannot be counted as a tip received in applying the provisions of sections 3(m)(2)(A) and 3(t). Similarly, where negotiations between a hotel and a customer for banquet facilities include amounts for distribution to employees of the hotel, the amounts so distributed are not counted as tips received.
>
> (b) As stated above, service charges and other similar sums which become part of the employer's gross receipts are not tips for the purposes of the Act. Where such sums are distributed by the employer to its employees, however, they may be used in their entirety to satisfy the monetary requirements of the Act.

In the factually similar case of *Nelson v. MLB Hotel Manager, LLC*, 2022 U.S. App. LEXIS 19298 (11th Cir. July 13, 2022), the plaintiff, who worked as a server at La Sombra, a restaurant located within the Fairwinds Hotel in Miami Beach, sued her employers under the FLSA claiming that, even though she was paid an amount that exceeded the applicable minimum wage and minimum overtime compensation, the defendants' wage and overtime requirements could not be satisfied, in part, by amounts generated through a service charge. *Id.* at *1. Looking to the similar and recently decided case of *Compere v. Nusret Miami, LLC*, 28 F.4th 1180 (11th Cir. 2022), where the court found that a mandatory "service charge was not a tip and could lawfully be used to offset [the employer's] wage obligations under the FLSA," *id.* at 1182, the *Nelson* court held:

> Our recent decision in *Compere* dictates the outcome of this appeal. There, we held that a mandatory "service charge was not a tip under the FLSA or other DOL regulations." 28 F.4th at 1186. Like the district court, we explained that "the critical feature of a 'tip' is that '[w]hether a tip is to be given, and its amount, are matters determined solely by the customer." *Id.* (quoting 29 C.F.R. § 531.52(a)). And because "whether and how much to pay" for a mandatory service charge are matters

> "not 'determined solely by the customer,'" we concluded that such a "service charge is not a tip" and could be used "to meet [the employer's] wage obligations under the FLSA." *Id.* at 1182, 1186; see also 29 C.F.R. § 531.55(a) ("A compulsory charge for service, such as 15 percent of the amount of the bill, imposed on a customer by an employer's establishment, is not a tip . . . ."). That is precisely the case here. La Sombra imposed an "automatic, non-discretionary service charge of 20%" on its customers' bills. And Nelson fails to identify any record evidence suggesting that a customer could unilaterally decide not to pay the charge… Thus, they could be credited toward the defendants' minimum wage and overtime obligations.

*Nelson*, 2022 U.S. App. LEXIS 19298 at 6.

Similarly, in *Rosell v. VMSB, Ltd. Liab. Co.*, 2021 U.S. Dist. LEXIS 116663 (S.D. Fla. June 22, 2021), the plaintiffs were servers at an up-scale, high-volume restaurant on Miami Beach operated by the defendants and were compensated with a combination of an hourly wage and a shared automatic fee (guests were billed 20-22% of the total sales price for food and beverage and included the cost on every check regardless of the size of the guest party or the amount of the bill). *Id.* at 3. When employees presented a final check to the customer, the check included the automatic fee and a separate line for a discretionary tip; if customer left a gratuity, the employee who serviced the guest kept the tip and was under no obligation to share it with his or her colleagues. *Id.* at 3.

The *Rosell* plaintiffs claimed the automatic service should be construed as a tip and not counted toward any of the employer's wage obligations, but the defendants claimed that the plaintiffs received a salary above any statutory requirements when their direct wages were combined with the service charge. *Id.* at 4. After an extensive analysis, Judge Torres found that the fee was a mandatory service charge that, when added to the employees' direct wages, satisfied the defendants' statutory minimum wage obligations to the plaintiffs. *Id.* at 49.

These two cases are on all fours with the case here, even as to the fact that the restaurants were upscale, South Beach establishments. This Court should follow *Nelson* and *Rosell* in finding that the payment methodology for servers at The Bath Club did not violate the FLSA.

7

**ASSOULINE & BERLOWE, P.A.**
2385 N.W. Executive Center Drive, Suite 100, Boca Raton, FL 33431 • Telephone: 561-361-6566

c. **<u>Vega received all of her tips and even more.</u>**

The rare tips that members left for servers were posted to the server's payroll records and paid to the server in their b-weekly paycheck. *See* Exhibit "F." Vega's claim that she suffered "a per-shift shortfall of $510.00, plus an additional $3,000.00 for mandatory gratuities retained by Defendants during event shifts" – equal to $79,500 and doubled to $159,000 – simply has no merit.

Additionally, Vega's claims must be questioned as Vega's co-workers told Club Management[9]:

- Usai and Giua allowed Vega to work only half her scheduled shifts, yet she received payment as if she worked a full shift (without clocking in or out);

- Usai and Giua invited their friends and family (who were *not* members of The Bath Club) to eat and drink without payment and, when cash tips were occasionally left by such customers (since their checks were not recorded in the point-of-sale system), Usai, Giua and Vega took the cash for themselves; and

- Even if Vega was assigned a full-time schedule, she did not work the hours assigned but was nonetheless paid as if she had worked a full-time schedule. Apparently, Vega had someone else clock in for her so that when Vega arrived to work 2-3 hours after her start time, she was paid as if she worked her entire shift.

Finally, Vega's claim that she was retaliated against for complaining about her wages also lacks any merit as the resigned from her employment on August 25, 2023. *See* CLUBMANAGEMENT000285-290[10], attached as Exhibit "J."

d. **<u>Vega has not provided any calculations as to the alleged wage theft.</u>**

In the statement of claim, Vega fails to set forth (i) how many shifts she worked during her dates of employment, (ii) the difference between what she was actually paid and what she claims

---

[9] *See* Exhibit "M" at Interrogatory #1 (summary of witnesses Rommy Fuentes Castro and Livi Reyes), *infra*.

[10] Vega's claim of constructive discharged because she was demoted from "captain" to server also lacks merit as both positions perform the duties of a server, regardless of the title. Although Vega was placed on the work schedule, she refused to work as a server and resigned. *See* Exhibit "J."

8

**ASSOULINE & BERLOWE, P.A.**
2385 N.W. Executive Center Drive, Suite 100, Boca Raton, FL 33431 • Telephone: 561-361-6566

should have been paid, and (iii) whether she was even a non-exempt, customarily-tipped employees. There are simply no calculations or any estimate as to the alleged theft nor are there any facts to support the absurd allegations that her tips were stolen in a cashless operation managed and overseen by Usai and Giua.

    e. **Usai & Giua continued and refined the foregoing payment policies.**

The payment policies about which Vega complains not only assured her compensation far in excess of a minimum wage but was in effect throughout her employment when Usai and Giua were managers of The Bath Club. In fact, Usai and Giua sought to refine, but not materially alter, these same policies.

On June 7, 2023, Giua sent an email to Janin Castro of HR Management Consultants, Inc. (HRMCS), an outside human resources consulting company retained by Usai and Giua for The Bath Club, regarding The Bath Club's policies for paying servers. *See* CLUBMIAM000299-302 attached as Exhibit "K." Then, on July 11, 2023, Giua sent Irving Padron, a consultant retained by Club Management, information about a July 12, 2023 presentation that HRMCS was going to make to all "front of house" staff on the revised compensation policies, including a tip pool notice, the guaranteed shift pay notice, and the service charge distribution notice. *See* CLUBMIAM000303-306, 309-310, 315-316. attached as Composite Exhibit "L." The changes proposed would still guarantee Vega (either as a captain or a server) $240 per shift.

The changes proposed by Usai and Giua did not significantly differ from the policies that had been in effect from the start of their tenure, which policies are the very subject of Vega's FLSA claims. Consequently, to the extent this Court finds that Vega has a claim for wage theft, such claim should be made against Usai and Giua, *not* against Peebles, as addressed further below.

## III. PEEBLES HAS NO PERSONAL LIABILITY UNDER THE FLSA

Peebles does not have personal liability to Plaintiffs because Peebles never had "operational control" of The Bath Club as required by *Patel v. Wargo*, 803 F.2d 632, 637 (11th Cir. 1986). In grappling with the question of operational control, this Court has previously ruled:

> in determining whether a corporate officer should be individually liable for wage violations, courts often look at the economic reality of the relationship between the parties. This includes consideration of whether the defendant: (i) had the power to hire and fire the employees; (ii) supervised and controlled employee work schedules or conditions of employment; (iii) determined the rate and method of payment; and (iv) maintained employment records.

*Caterson v. Travel Res. Vacation Club "Inc."*, 2021 WL 1165896, at *3 (S.D. Fla. Jan. 13, 2021). *See also Villarreal v. Woodham,* 113 F.3d 202, 205 (11th Cir. 1997).

Peebles did not have the power to hire and fire employees (and did not hire or fire Slizskaya[11] or Vega[12]), did not supervise and control employees' work schedules or their conditions of employment, did not make any decisions as to employees' rate or method of payment (which was within the purview of Usai and Giua), and did not maintain any employment records. Moreover, Peebles' status as a corporate officer of Club Management does not render him an "employer" under the FLSA. *Olivas v. A Little Havana Check Cash, Inc.*, 324 F. App'x 839, 845 (11th Cir. 2009).

While Plaintiffs have attempted to allege Peebles' personal liability under the FLSA[13], the facts simply do not support such a finding. These facts were laid out by Peebles in his answers to Usai's interrogatories, attached as Exhibit "M," in which he stated under oath:

- Peebles attended *monthly* financial meetings with Usai and Giua;

---

[11] *See* Exhibits "B" and "C."

[12] Vega resigned from her employment. *See* Exhibit "J."

[13] This Court dismissed Plaintiff's complaint against Peebles [ECF 49]. Though Plaintiffs amended their complaint [ECF 57] and again named Peebles individually, Defendants will again be seeking to dismiss Peebles for the reasons set forth herein, *inter alia.*

- Peebles *never participated in operational decisions* regarding staffing, payroll, or employee discipline except as to the hiring, firing and compensation of Usai and Giua;

- Peebles hired Usai to run The Bath Club and expected him to do so independently without Peebles' oversight;

- When it became obvious that The Bath Club was hemorrhaging money, Peebles did instruct Usai to cut spending;

- *Peebles deferred to Usai* on all hiring, termination, payroll, and all other decisions regarding the operations at The Bath Club;

- Peebles had no role in the decision to terminate Slizskaya, whom Usai and Giua selected for termination as part of a downsizing;

- Peebles had no role in the decision to terminate Vega, whom he understood resigned; and

- Peebles knew from information provided by and presumably formulated by Usai and Giua that servers were being paid a flat fee per day ($240) so that they were guaranteed payment when they worked, but Peebles never established nor approved the policy and deferred to Usai and Giua to handle this matter.

*See* answers to Interrogatories ##5-6, 13-17 (emphasis added). Mr. Peebles also testified to these same facts (and more) during his October 20, 2025 deposition taken by Plaintiffs' counsel.

In fact, proof that Peebles *lacked* "operational control" over The Bath Club is underscored by his hiring of Usai and Giua: Usai was hired as "Director of Operations and Wine Club" and Giua was hired as "Restaurant & Lounge General Manager" [ECF 57 at ¶¶40]. Though Plaintiffs attempt to diminish Usai and Giua's authority – claiming that Jean Thielen Guerrero (an accountant) and "other managers" supervised Slizskaya and Vega [ECF 57 at ¶¶61] – Usai and Giua were the ones responsible for managing The Bath Club and its employees, including Slizskaya and Vega, whom Usai and Giua hired and, in the case of Slizskaya, fired. *See* Exhibits "B" and "C."

Plaintiffs expect this Court to believe that the hiring of Usai and Giua as director and manager of The Bath Club and paying them salaries of $170,000 and $130,000, respectively, was

11

**ASSOULINE & BERLOWE, P.A.**
2385 N.W. Executive Center Drive, Suite 100, Boca Raton, FL 33431 • Telephone: 561-361-6566

superfluous and unnecessary and that Peebles – simply due to his status as "managing member" of Club Management – was Plaintiffs' employer. The economic reality is that Usai and Giua, *not* Peebles, were Slizskaya and Vega's employers. As noted above, any FLSA claims in this action should be made against Usai and Giua as Slizskaya's and Vega's employers, *not* against Peebles.

### IV. CLUB MANAGEMENT IS NOT LIABLE FOR LIQUIDATED DAMAGES

As set forth above, Slizskaya was an exempt, salaried employee, to whom the FLSA's minimum wage, overtime and tip requirements never applied. Vega was a server (a customarily tipped employee) who was paid far in excess of the applicable tipped wage at all times during her employment.

Club Management had a good faith belief – and acted in reliance on the advice of Usai and Giua, the persons hired to run and manage The Bath Club – that they were paying Vega in accordance with the requirements of the FLSA. Further, Club Management neither knowingly nor systematically retained tips that were to be paid to Vega; the distribution of tips were directed and overseen by Usai and Giua without input from Club Management (or Peebles). There is simply no basis for Plaintiffs' claim for liquidated damages.

### V. CLUB MANAGEMENT IS NOT LIABLE FOR ATTORNEYS' FEES

Since neither Peebles nor Club Management are liable to Slizskaya or Vega for violations of the FLSA, Defendants also have no liability for Plaintiffs' counsel's attorneys' fees or costs.

## CONCLUSION

Though Defendants do not believe they bear any liability to Slizskaya and Vega for the FLSA claims asserted in this action, they will in good faith participate in the court-ordered settlement conference on November 14, 2025.

**ASSOULINE & BERLOWE, P.A.**

/s/ *Ellen M. Leibovitch*
ELLEN M. LEIBOVITCH
Florida Bar No. 656933
eml@assoulineberlowe.com
DANIEL E. VILLEVILLE
Florida Bar No. 940496
dev@assoulineberlowe.com
2385 N.W. Executive Center Dr., Suite 100
Boca Raton, FL 33431
Tel: (561) 361-6566

Attorneys for Defendants, Club Management Miami II, LLC, and R. Donahue Peebles